UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KELLY J. CHAVEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:14-cv-192 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the

Commissioner filed by the plaintiff, Kelly J. Chavez, on June 19, 2014. For the following

reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Kelly J. Chavez, filed an application for Supplemental Security Income on

November 16, 2010, alleging a disability onset date of September 1, 2007. (Tr. 9). The

Disability Determination Bureau denied Chavez's application on June 23, 2011, and again upon

reconsideration on December 15, 2011. (Tr. 9). Chavez subsequently filed a timely request for a

hearing on December 19, 2011. (Tr. 9). A hearing was held on December 10, 2012, before

Administrative Law Judge (ALJ) Yvonne K. Stam, and the ALJ issued an unfavorable decision

on February 21, 2013. (Tr. 9, 21). Vocational Expert (VE) Marie N. Kieffer, Kathy Lewis,

Chavez's mother, and Chavez testified at the hearing. (Tr. 9). The Appeals Council denied

review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3).

At step one of the five step sequential analysis for determining whether an individual is

disabled, the ALJ found that Chavez had not engaged in substantial gainful activity since

November 16, 2010, over three years after her alleged onset date of September 1, 2007. (Tr. 11). At step two, the ALJ determined that Chavez had the following severe impairments: obesity, migraine headaches, degenerative disc disease, acoustic neuroma, anxiety, and depression. (Tr. 11). At step three, the ALJ concluded that Chavez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 11).

In determining whether Chavez had an impairment or combination of impairments that met the severity of one of the listed impairments, the ALJ first considered the Paragraph B criteria. (Tr. 11). The ALJ indicated that an impairment satisfies Paragraph B when the mental impairment results in at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 11). Additionally, the ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 11).

The ALJ concluded that Chavez had a mild restriction in daily living activities. (Tr. 12). Chavez reported that she could care for her personal needs, care for her daughter and nephew including driving them to and from school, and perform some household work. (Tr. 12). The ALJ found those daily living activities consistent with the record as a whole and concluded that Chavez had a mild limitation in handling her daily activities independently, appropriately, effectively, and on a sustained basis. (Tr. 12).

The ALJ found that Chavez had moderate difficulties in social functioning. (Tr. 12). Chavez indicated that her shyness caused difficulty in getting along with others but that she lived with her parents and cared for her daughter and nephew. (Tr. 12). The ALJ determined that was consistent with the record and found that Chavez had moderate limitations interacting independently, appropriately, effectively, and on a sustained basis with other people. (Tr. 12).

The ALJ found that Chavez had moderate difficulties in concentration, persistence, or pace. (Tr. 12). Although Chavez reported that she completed word search puzzles, read novels, and could count change and use a checkbook or money order, tests during her psychological evaluation determined that she had moderate difficulty in this area, which the ALJ found consistent with the record. (Tr. 12). Therefore, the ALJ indicated that Chavez had moderate limitations in sustaining focus, attention, and concentration long enough to complete tasks commonly found in a work setting timely and appropriately. (Tr. 12).

The ALJ determined that Chavez had experienced no episodes of decompensation of extended duration. (Tr. 13). She defined episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." (Tr. 13). The ALJ stated that the record provided little support that Chavez suffered any episodes of decompensation. (Tr. 13). Therefore, the ALJ found that Chavez did not satisfy Paragraph B because her mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration. (Tr. 13).

The ALJ also determined that Chavez did not meet the requirements for Paragraph C under Listing 12.04 or 12.06. (Tr. 13). The ALJ indicated that Chavez did not meet Listing

12.04 because she did not have repeated episodes of decompensation, a residual disease process, or an inability to function outside a highly supportive environment. (Tr. 13). Additionally, she stated that Chavez did not meet Listing 12.06 because Chavez did not demonstrate a complete inability to function independently outside her home. (Tr. 13).

The ALJ indicated that there was no specific listing criteria for headaches but stated that she considered that impairment under Listing 11.00. (Tr. 12). Additionally, she concluded that the medical evidence did not meet the requirements for a severe impairment. (Tr. 12). The ALJ determined that the medical evidence did not establish a nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis under Listing 1.04. (Tr. 12). Furthermore, she concluded that Chavez's back disorder did not prevent her from ambulating effectively under Listing 1.00(B)(2)(b). (Tr. 12).

The ALJ also stated there were no listing criteria in Appendix 1 for evaluating obesity impairments but that SSR 02-1p required her to consider the effects of obesity when determining whether Chavez had a severe medically determinable impairment, whether Chavez's impairments met or equaled any listing, and in determining the RFC. (Tr. 12). The ALJ noted that obesity may adversely affect the body, cause additional pain and limitation than from an impairment alone, and limit an individual's ability to sustain activity on a regular and continuing basis during a full time work schedule. (Tr. 12). The ALJ stated that she considered the effects of obesity in reaching her conclusions at the second through fifth steps of the evaluation process, although she found that no treating or examining medical source specifically attributed any additional or cumulative limitations to Chavez's obesity. (Tr. 12).

The ALJ then assessed Chavez's residual functional capacity as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) in that the claimant is able

to lift 20 pounds occasionally and 10 pounds frequently, stand and walk in combination about 6 hours and sit about 6 hours with no additional limitations on the ability to push and pull. She is unable to climb ladders, ropes or scaffolds; is limited to only occasional stooping, kneeling and crouching; should avoid concentrated exposure to vibration; should avoid all exposure to hazards such as unguarded machinery and unprotected heights; is limited to unskilled, simple and routine tasks, with only a small number of tasks, in a relatively unchanging setting and process, with no fast pace; and with no more than brief and superficial contact with others.

(Tr. 13). The ALJ explained that in considering Chavez's symptoms she followed a two-step process. (Tr. 14). First, she determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Chavez's pain or other symptoms. (Tr. 14). Then, she evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Chavez's functioning. (Tr. 14). Additionally, the ALJ considered Chavez's subjective allegations, her prior work history, and the observations of non-medical third parties and treating and examining physicians. (Tr. 14).

Chavez has alleged that she suffered from a brain tumor, depression, chronic fatigue syndrome, migraines, acoustic shwannoma, anxiety, dizzy spells, memory loss, degenerative disc disease, Raynaud's syndrome, and numbness in the hands and feet at a disabling level. (Tr. 14). Chavez has claimed that her migraines caused her to miss several days per month at her job at Plastech as a trimmer, that her factory job was too stressful, and that she had difficulty with small details. (Tr. 14). Chavez was laid off from her factory job along with several other employees. (Tr. 14). She reported that her migraines had continued and that her migraine medication changed several weeks before the hearing. (Tr. 14). Despite taking medication, Chavez's migraines would last a few days. (Tr. 14). Additionally, her hands felt numb

periodically and she had difficulty with her left knee due to a torn meniscus. (Tr. 14). However, Chavez indicated that she did housework, cared for her personal needs with some difficulty, drove her daughter and nephew to and from school, shopped, read, played with her daughter, watched television, and completed high school. (Tr. 14).

The ALJ found that Chavez's medically determinable impairments reasonably could cause some of the alleged symptoms, but she found Chavez incredible regarding the intensity, persistence, and limiting effects of the symptoms. (Tr. 14–15). The ALJ indicated this was a Title XVI claim only and therefore, her analysis of the evidence primarily focused from November 16, 2010, the date of the Title XVI application, and onward. (Tr. 15). However, she reviewed all the evidence in the record before determining that only the period after November 16, 2010 was under active consideration. (Tr. 15).

First, the ALJ found that the objective medical evidence was inconsistent with Chavez's alleged level of pain and limiting effects. (Tr. 15). Prior to the current application date, an MRI of the brain showed acoustic neuroma, and a subsequent audiogram demonstrated normal hearing. (Tr. 15). Several months later, imaging studies revealed no change in the left CPA mass and no other significant pathology. (Tr. 15). Additionally, an MRI of the cervical spine indicated minimal central disc bulging, and a nerve conduction study was within normal limits. (Tr. 15). A few months later, a follow up MRI of the brain continued to show no significant change in the left-sided vestibular shwannoma. (Tr. 15). Additionally, an examination showed that Chavez's cranial nerves were grossly intact, sensory was intact, and arm and leg strength was grossly normal. (Tr. 15). Chavez complained of headaches and numbness in both hands that extended up her arms. (Tr. 15). In 2009, she went to the emergency room on several

occasions for intermittent worsening headaches. (Tr. 15). Chavez's vital signs revealed mild tachycardia and mild diastolic elevation, which improved with medication and time. (Tr. 15).

In December 2010, Chavez underwent a CT of the lumbar spine because of bilateral leg weakness and numbness and low back pain. (Tr. 15). The CT revealed mild disc bulges, mild broad-based right paracentral protrusion with annular tear, no significant stenosis, and mild degenerative disc disease. (Tr. 15). In January 2011, she went to the emergency department after falling and hurting her back and hip. (Tr. 15–16). During the exam, Chavez experienced pain when moving her left hip but had a negative straight leg raise. (Tr. 16). An x-ray of her back and hip showed clips from left hemipelvic phleboliths and tubal ligation but was otherwise unremarkable. (Tr. 16).

The following month, Chavez reported numbness down the lateral aspect of both legs. (Tr. 16). Nerve conduction studies demonstrated no significant evidence of neuropathy. (Tr. 16). However, the record revealed that she appeared to have sciatic-type symptoms and was advised to perform stretching exercises. (Tr. 16). Also in January 2011, an MRI of the brain revealed a stable size and configuration of the left acoustic neuroma. (Tr. 16). In March 2011, Chavez did not show any progression on her MRI of the brain, and she was advised to return in six months for an additional MRI. (Tr. 16). A physical examination in March 2011 revealed no cranial nerve or sensory abnormalities and normal motor strength, gait, and stance. (Tr. 16). The ALJ found those diagnostic and physical examination findings essentially normal and inconsistent with Chavez's claims of disabling pain and symptoms. (Tr. 16).

In April 2011, Chavez went to the emergency department for a migraine headache that radiated pain from her neck to left arm. (Tr. 16). She reported that she did not take any medication at home. (Tr. 16). The exam revealed grossly intact motor and sensory and no focal

neurological findings.  (Tr. 16).  Chavez received medication that improved her headache and was sent home.  (Tr. 16).  In June 2011, she returned to the emergency department for migraine headaches and flank pain.  (Tr. 16).  After receiving medication, Chavez appeared well and more cheerful and received a prescription for Ultram.  (Tr. 16).  In July 2011, she went to the emergency department again with similar complaints, and she was advised to rest in a dark quiet environment and to increase her oral hydration.  (Tr. 16).  Also in July, she underwent an esophagogastroduodenoscopy with biopsy and was diagnosed with gastritis.  (Tr. 16).  In August 2011, a brain MRI showed that her left acoustic neuroma had decreased minimally.  (Tr. 17). The ALJ noted that Chavez had complained of migraines on several occasions but concluded that the migraines would not cause her to miss work more frequently than tolerated in a competitive environment.  (Tr. 16).

In March 2012, Chavez went to the emergency department for migraine headaches and denied any neurologic symptoms, such as unilateral weakness or numbness.  (Tr. 16).  An exam showed that her cranial nerves were intact, good hand grasps bilaterally, and normal leg strength. (Tr. 16).  Also in March, Chavez went to the Fort Wayne Neurological Center complaining of migraines and dizziness and received several medications.  (Tr. 16).  In May 2012, she complained that her headaches had worsened, and she was prescribed a new medication.  (Tr. 16).  In a September 2012 exam, Chavez exhibited pain over the left occipital ridge, but she had negative Romberg, her cranial nerves were intact, and her cervical range of motion was preserved.  (Tr. 16).  Additionally, she was diagnosed with significant tension headaches, occipital neuralgia, and recurrent migraine headache without aura.  (Tr. 16).  The ALJ found it significant that Chavez took a factory job that she claimed overwhelmed her.  (Tr. 16).  The ALJ concluded that Chavez's ability to continue working suggested that her pain was not as severe as

alleged.  (Tr. 16).  Moreover, the ALJ indicated that Chavez claimed her migraines would cause her to miss substantial amounts of work.  (Tr. 16).  However, the ALJ determined that her employer's attendance report contradicted that claim and demonstrated that she would not miss time in excess of what would be tolerated in a competitive environment.  (Tr. 16).

In October 2012, Chavez complained that she popped her left knee going down stairs, had pain in her left ankle and hip, and went in for treatment.  (Tr. 17).  An exam indicated that her left patellar area was slightly tender to palpation and that she had a slightly lax anterior Lachman test with discomfort on her medial joint.  (Tr. 17).  She was diagnosed with a sprained left knee and advised to follow up with an orthopedist.  (Tr. 17).  In November 2012, Chavez followed up with an orthopedist and complained of knee pain with clicking, giving way, and popping.  (Tr. 17).  An exam revealed an antalgic gait and quad atrophy but no effusion.  (Tr. 17).  Imaging studies showed a small amount of joint fluid and small fibrous cortical defects.  (Tr. 17).  Chavez was diagnosed with left knee pain, left patellar tendinitis, and a hamstring muscle strain and was given a therapy prescription.  (Tr. 17).

In December 2012, Chavez underwent an EMG on her legs after she complained of numbness that radiated from her left popliteal fossa.  (Tr. 17).  The exam revealed intact reflexes, sensory dermatomes, and motor power.  (Tr. 17).  Furthermore, nerve conduction studies and a needle examination showed no evidence of radiculopathy or mononeuropathy.  (Tr. 17).  Physical therapy progress notes indicated that Chavez advanced in all levels of the program with minimal residual symptoms and that she continued to perform pulley exercises at home and the office.  (Tr. 17).  However, ten days later she called her doctor and complained of pain and swelling in her left knee.  (Tr. 17).  Chavez reported the pain as a seven or eight and described it as sharp, stabbing, and achy.  (Tr. 17).  The ALJ stated there were no further records for her knee

pain after that claim and found that those findings did not suggest that Chavez was unable to work.  (Tr. 17).

The ALJ indicated that Chavez was obese according to the National Institute of Health's Body Mass Index.  (Tr. 17).  She stated that she considered SSR 02-1p, which instructs ALJs to consider the effects of obesity.  (Tr. 17).  Additionally, the ALJ noted that consideration was given to any functional limitations resulting from obesity in the RFC assessment in addition to any limitations from other physical or mental impairments when obesity was identified as a medically determinable impairment.  (Tr. 17).

The ALJ then discussed Chavez's mental impairments and noted that she was alert and oriented to time, place, and person and in no acute distress during her medical visits for physical conditions.  (Tr. 17).  Additionally, her cognitive functioning was normal and her mood was euthymic.  (Tr. 17).  Chavez's more recent records from March 2012, noted that she denied anxiety or depression.  (Tr. 17).  However, in June 2011, she underwent a psychological evaluation with Dr. Neil Shamberg and reported stress, generalized anxiety disorder, and major depression.  (Tr. 17).  Additionally, she claimed that she was prescribed Cymbalta but still felt depressed and anxious "most of the time."  (Tr. 17).  The ALJ noted that Chavez never had inpatient or outpatient psychiatric treatment, psychotherapy, or counseling.  (Tr. 17).  Therefore, the ALJ concluded that Chavez's mental impairments were not as severe as alleged.  (Tr. 17).  Moreover, the ALJ determined that Chavez would have sought some form of mental health treatment if her impairments were as severe as alleged.  (Tr. 17).

Chavez reported that she often cried and worried about being a single parent but was never suicidal.  (Tr. 17).  Additionally, she claimed she had decreased energy, irregular eating patterns, and difficulty sleeping and that her mental impairments interfered with her

concentration and short-term memory. (Tr. 17). During a mental status exam, Chavez appeared tense, shy, and depressed and avoided eye contact with Dr. Shamberg. (Tr. 17). However, she also was polite, cooperative, and did not manifest any bizarre behavior. (Tr. 17–18).

Chavez scored moderately below average in short-term memory but her overall functioning level was in the middle or low end of Wechsler's average range. (Tr. 18). Additionally, her thought processes were coherent, logical, and goal directed, she had insight into her depression and anxiety disorders, and her judgment was in the average range. (Tr. 18). Dr. Shamberg concluded that Chavez appeared capable of managing her funds in a realistic manner and diagnosed her with major depressive disorder, generalized anxiety disorder, and a specific phobia of drowning. (Tr. 18). The ALJ concluded that those findings suggested some mental limitations but found that they did not support Chavez's claims of a disabling mental impairment. (Tr. 18).

The ALJ noted that Chavez was assessed with a global assessment of functioning rating of 45 and that a rating of 45 indicated serious symptoms or a serious impairment in social, occupational, or school functioning. (Tr. 18). However, the ALJ also indicated that a GAF is not dispositive but only offers some evidence regarding Chavez's mental impairment. (Tr. 18). Moreover, she stated that a GAF score is merely a snapshot of Chavez's ability to function at a particular time and that it included factors that were not part of the disability analysis under the Social Security Act, such as legal, housing, or financial problems. (Tr. 18).

The ALJ found that Chavez's impairment caused some limitations. (Tr. 18). However, she concluded that Chavez was capable of light work with a few postural and environmental limitations from a physical standpoint based on the treatment notes, minimal objective findings, physical examinations, and activities of daily living. (Tr. 18). Additionally, based on the same

evidence, the ALJ determined that Chavez had limitations from a mental standpoint for concentration, persistence, and pace and social demands.  (Tr. 18).

The ALJ afforded little weight to the opinion of Dr. Shamberg because she found his opinion inconsistent with the RFC assessment.  (Tr. 18).  First, the ALJ indicated that Dr. Shamberg relied heavily on Chavez's subjective allegations from one specific occasion and that there were no other psychological findings that Chavez was severely limited in persistence or her ability to respond appropriately to work pressures in most work settings.  (Tr. 18).  Additionally, the ALJ found his opinion inconsistent with Chavez's activities of daily living that included doing word search puzzles, performing some housework, reading novels, and driving her daughter and nephew to school.  (Tr. 18).  Last, she found Dr. Shamberg's opinion vague because he used the terms severely and moderately, which the ALJ concluded did not provide any functional limitations with specificity.  (Tr. 18).

The ALJ afforded greater weight to the opinions of the non-examining State agency medical consultants because she found their opinions consistent with the evidence as a whole.  (Tr. 18).  Additionally, she stated that their RFC conclusions supported the finding that Chavez was not disabled.  (Tr. 18).  The ALJ acknowledged that the opinions of non-examining physicians generally do not deserve as much weight as examining or treating physicians but concluded that these opinions deserved some weight because a number of other reasons supported similar conclusions.  (Tr. 18–19).

The ALJ found that Chavez's allegations of significant limitations in her activities of daily living was inconsistent with her ability to perform various activities.  (Tr. 19).  Specifically, she noted that Chavez could attend to her personal care needs, perform household duties, shop, watch television, care for her daughter, count change, and use a checkbook or money order.  (Tr.

19). Additionally, the ALJ determined that those activities were consistent with the RFC assessment. (Tr. 19).

The ALJ also found inconsistencies between the record and Chavez's description of her symptoms and limitations. (Tr. 19). Chavez alleged extreme functional limitations, but the ALJ concluded that the medical evidence did not support those allegations. (Tr. 19). Specifically, the ALJ noted that Chavez claimed her pain level had increased and that she was in constant pain, but the ALJ stated the objective findings did not change. (Tr. 19). The ALJ indicated that Chavez's condition did not deteriorate and that she did not have any additional medical difficulties. (Tr. 19). Moreover, her condition had stabilized, and her physicians recommended conservative treatment. (Tr. 19). Furthermore, Chavez claimed that she could not afford any mental health treatment, but the ALJ found no indication that she sought free or low-cost treatment. (Tr. 19).

Ultimately, the ALJ concluded that her RFC assessment was supported by the objective medical evidence in the record. (Tr. 19). She found that the treatment notes did not support Chavez's allegations of disabling conditions and that Chavez's credibility was weakened by the inconsistency between her allegations and the medical evidence. (Tr. 19). Although the ALJ stated that Chavez may not have intentionally misled the ALJ, she indicated that the inconsistencies made Chavez not entirely reliable. (Tr. 19). The ALJ concluded that Chavez experienced some levels of pain and limitations but only to the extent described in the RFC. (Tr. 19).

At step four, the ALJ found that Chavez had no past relevant work and therefore, that transferability of job skills was not an issue. (Tr. 19). Considering Chavez's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that

Chavez could perform, including electronics worker (200 jobs regionally, 2,000 jobs in Indiana, and 100,000 jobs nationally), small products assembler (3,000 jobs regionally, 50,000 jobs in Indiana, and 900,000 jobs nationally), and office helper (200 jobs regionally, 3,000 jobs in Indiana, and 200,000 jobs nationally).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. § 416.920(b)**. If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. § 416.920(e)**. However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work,

then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  **42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f)**.

First, Chavez has argued that the ALJ failed to account for her headaches in the RFC assessment.  SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation.  In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis.  This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted).  Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what she must articulate in her written decision.  "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions."  ***Getch v. Astrue***, 539 F.3d 473, 480 (7th Cir. 2008) (quoting ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000)); *see* ***Moore v. Colvin***, 743 F.3d 1118, 1123 (7th Cir. 2014).  Although the ALJ does not need to discuss every piece of evidence, she cannot ignore evidence that undermines her ultimate conclusions.  ***Moore***, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not

support her conclusion and explain why that evidence was rejected.") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

Chavez indicated that her migraine headaches were documented back to 2007 and that she had a migraine headache everyday by October 2008. In September 2009, Dr. Crisman concluded that her headaches were possibly secondary to CyberKnife treatment and depression. (Tr. 378). In the following year and half, Chavez went to the emergency room multiple times with migraine headaches and continued to complain about migraine headaches. In January 2011, she reported having one or two migraines per week, a decrease in frequency. However, she went in for treatment six times between February and July 2011 and continued to complain of migraines through the spring of 2012. Additionally, she claimed that no medication ended her migraines and that the frequency and intensity of her migraines increased after starting a job.

The ALJ found that Chavez's migraines were a severe impairment. A severe impairment "significantly limits an individual's physical or mental abilities to do basic work activities . . . ." SSR 96-3p. However, the ALJ also concluded that "there is no indication that these headaches would preclude her from performing all work more frequently than tolerated in competitive employment." (Tr. 16). Chavez has argued that it is unclear how the ALJ reached that conclusion and that the ALJ failed to account for her migraine headaches in the RFC assessment.

First, Chavez has argued that the ALJ drew improper inferences from her MRIs and physical examinations. Specifically, she claimed that the ALJ "played doctor" by inferring that Chavez's stable and normal findings meant her disabling migraine allegations were not credible.

Chavez indicated that a doctor never concluded that Chavez's MRI or other examinations must be abnormal for her migraine claims to be credible.

The Government has argued that there was no support that the ALJ suggested Chavez's findings needed to be abnormal to suggest a disability finding. Additionally, it claimed that the ALJ did not doubt Chavez's migraine diagnosis. Furthermore, the Government has argued that the ALJ did not determine what symptoms or signs must be present to support Chavez's migraine claims or conclude that because those symptoms or signs were not present that Chavez was not disabled.

Although the ALJ did not find that specific symptoms must be present and were missing, she did rely on Chavez's normal MRI and other examination findings to conclude that Chavez's claims were not entirely credible. For example, the ALJ relied on a stable MRI and normal physical examination findings to conclude that "[t]hese essentially normal diagnostic and physical examination findings are inconsistent with [Chavez's] allegations of disabling pain and symptoms." (Tr. 16). Additionally, the ALJ found Chavez's increasing pain allegations not credible because the objective medical evidence had not changed and her condition had stabilized, did not deteriorate, and did not show any additional medical difficulties. (Tr. 19). However, no doctor suggested that Chavez's MRI or physical examinations must be abnormal or that her condition must deteriorate to conclude that Chavez's migraine claims were credible. Therefore, the ALJ's reliance on normal medical findings without a doctor's opinion supporting that reliance is not supportable. *See **Moon v. Colvin***, 763 F.3d 718, 722 (7th Cir. 2014) (finding that an ALJ's reliance on unremarkable MRI evidence was not supportable when no doctor suggested that the MRI finding correlated with the claimant's migraines).

Next, Chavez has claimed that the ALJ's reliance on her attendance report provided little probative value.  She argued that the attendance report covered too small a sample size, seventy-eight days, to find it inconsistent with Chavez's allegations of disabling migraines.  Additionally, Chavez noted that she had suffered from migraines for five years by that point and that she missed a full day of work and was late on three occasions during the seventy-eight days.  Moreover, she argued that any inconsistency was *de minimus* when considering the five year treatment history, that her migraines were unpredictable and occurred with varying frequency and severity, and that the attendance report provided too small a sample size to find Chavez incredible.

The Government has argued that the ALJ reasonably considered the attendance report.  The ALJ noted that the factory job overwhelmed Chavez but that her continued attendance suggested her pain was not as severe as alleged.  Additionally, Chavez alleged that she missed substantial time from work because of her migraines, but the ALJ found that the attendance report contradicted that claim and that she did not miss in excess of what would be tolerated in a competitive environment.  Furthermore, the Government indicated that Chavez missed one day of work for a doctor appointment and was late three times, which included being late one time because of a migraine.

The ALJ discounted Chavez's migraine allegations because she was able to work during a seventy-eight day period in 2012 while only missing one day of work and being late three times.  She concluded that Chavez's attendance report demonstrated that Chavez could work in a competitive environment.  However, she did not explain why an attendance report over a seventy-eight day period discounted Chavez's claims of migraines dating over five years.  Furthermore, she did not explain why that seventy-eight day period was inconsistent with

Chavez's allegations that her migraines varied in frequency and severity over the course of her treatment. The ALJ did not create a logical bridge when discounting Chavez's complaints over a five year period based on an attendance report covering seventy-eight days.

Next, Chavez has argued that the ALJ failed to identify how frequently she believed Chavez's migraines occurred. The VE testified that a person who consistently misses two or three days of work a month or twelve or more days a year cannot maintain competitive employment. (Tr. 49). Therefore, Chavez claimed that she must miss less than one day per month for a severe migraine and that the evidence did not support a finding that her migraines were so infrequent. Although Chavez admitted that the frequency of her migraines varied, she claimed that she had more than twelve severe migraines per year.

The Government has indicated that the ALJ was not required to identify how frequently Chavez's migraines occurred and that Chavez cited no authority to support that claim. Rather, it has argued that the ALJ considered the medical and non-medical evidence, Chavez's reported symptoms, and the medical source opinions pursuant to SSR 96-8p. Furthermore, the Government has claimed that the Seventh Circuit's "minimal articulation" standard did not require the ALJ to provide an explanation for every piece of evidence.

Chavez has not presented authority that requires the ALJ to specifically determine how frequently her migraines occur. However, the ALJ must indicate whether Chavez can perform and sustain work activities on a regular and ongoing basis. *Converse v. Apfel*, 144 F. Supp. 2d 1045, 1051 (N.D. Ind. 2000). The ALJ concluded that Chavez's migraines did not prevent her from working based on the objective medical evidence's normal findings and the seventy-eight day attendance report. As discussed above, the ALJ's reliance on the normal objective medical evidence findings was not supported, and she did not provide a logical bridge between the

attendance report and discounting all of Chavez's migraine claims. Therefore, the ALJ must address those issues on remand.

Chavez also has claimed that the ALJ did not provide a good reason for rejecting Dr. Shamberg's opinion. Generally, an ALJ affords more weight to the opinion of an examining source than the opinion of a non-examining source but the ultimate weight given depends on the opinion's consistency with the objective medical evidence, the quality of the explanation, and the source's specialty. *Givens v. Colvin*, 551 Fed. App'x 855, 860 (7th Cir. 2013); 20 C.F.R. § 404.1527(c). "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ may give less weight to an examining source's opinion when it appears to rely heavily on the claimant's subjective complaints. *Givens*, 551 Fed. App'x at 861; *see* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give the opinion. The better explanation a source provides for an opinion the more weight we will give that opinion."); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

The ALJ reviewed Dr. Shamberg's examination and noted his findings regarding Chavez's mental impairments and limitations. (Tr. 17–18). However, the ALJ afforded Dr. Shamberg's opinion little weight. (Tr. 18). First, the ALJ noted that Dr. Shamberg relied heavily on Chavez's subjective allegations from one specific examination and that no other psychological findings indicated that Chavez was severely limited with regard to persistence or in her ability to respond to most work pressures. (Tr. 18). Chavez has argued that the ALJ ignored Dr. Shamberg's "serial 7" test results when concluding that no other psychological

findings supported that Chavez was severely limited in persistence. However, Dr. Shamberg did not cite the "serial 7" test results when concluding that Chavez was severely limited in persistence. Rather, he noted her slowness and depression for Chavez's limitation in persistence. Therefore, the ALJ did not err by ignoring the "serial 7" test results because the doctor that found the limitation in persistence did not indicate that it supported his conclusion.

Additionally, Chavez has argued that the ALJ's conclusion that Dr. Shamberg's opinion relied heavily on Chavez's subjective allegations was not supported by the record. Chavez claimed that Dr. Shamberg based his opinion on Chavez's self-reports, his examination, and data from the SSA. However, Dr. Shamberg stated "the bulk of the information here was provided by the claimant's own self report." (Tr. 521). The ALJ can give less weight to an examining source's opinion when it relied heavily on the claimant's subjective complaints. *Givens*, 551 Fed. App'x at 861; *see* 20 C.F.R. § 404.1527(c)(3). The ALJ found that Dr. Shamberg's opinion relied heavily on Chavez's subjective complaints, and Dr. Shamberg indicated that most of the information he used was from Chavez's self-report. Therefore, the ALJ could give less weight to Dr. Shamberg's opinion based on that finding.

Next, Chavez has claimed that the ALJ erred in finding that Dr. Shamberg's opinion was inconsistent with Chavez's ability to perform daily living activities such as reading novels, doing word search puzzles, performing some housework, and driving her daughter and nephew to school. Chavez indicated that Dr. Shamberg was aware of her daily living activities when making his conclusion. (Tr. 523). The ALJ did not explain why Dr. Shamberg's opinion was inconsistent with Chavez's daily living activities but only stated that his opinion was inconsistent with them. Because this matter is being remanded on a separate issue, the ALJ will have an opportunity to explain this conclusion.

Last, the ALJ afforded Dr. Shamberg's opinion little weight because she found it vague and that it did not specifically provide any functional limitations. (Tr. 18). Chavez has argued that the ALJ should have recontacted Dr. Shamberg to resolve any questions about his opinion. However, the Government has argued that the ALJ was entitled to evaluate the evidence supporting Dr. Shamberg's opinion and that she properly found his opinion unsupported by and inconsistent with the record evidence. "An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). However, an ALJ may evaluate the evidence and explanations that support a medical source's findings and may conclude that the evidence failed to support the medical source's findings. *Simila v. Astrue*, 573 F.3d 503, 516–17 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527(d)(3).

Here, the ALJ discussed the evidence upon which Dr. Shamberg relied: Chavez's subjective complaints, her general appearance, and his findings regarding her overall level of functioning and short-term memory. However, the ALJ did not find that the supporting evidence was vague and non-specific but that Dr. Shamberg used vague terms and did not provide a specific functional limitation finding. Therefore, Chavez has argued that Dr. Shamberg's report was inadequate or incomplete and that the ALJ was required to contact him to revise his report or furnish any missing information.

The Commissioner will review a consultative examiner's report to determine whether specific information was furnished. 20 C.F.R. § 416.919p(a); *see Davison v. Astrue*, 370 Fed. App'x 995, 997 (11th Cir. 2010). "If the report is inadequate or incomplete, [SSA] will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a

revised report." 20 C.F.R. § 416.919p(b). A complete report includes: (1) the claimant's major complaints; (2) a detailed history of the major complaints; (3) a description and disposition of pertinent "positive" and "negative" findings; (4) the results of any tests performed according to the Listing of Impairments requirements; (5) the diagnosis and prognosis of the impairments; (6) a statement about what the claimant can do despite her impairments describing her ability to do work related activities; and (7) an explanation or comment on the major complaints and any other abnormalities found. 20 C.F.R. § 416.919n(c)(1)–(7). However, a report is not rendered incomplete if it is missing a statement about what the claimant can do despite her impairments. 20 C.F.R. § 416.919n(c)(6).

The ALJ found Dr. Shamberg's statements regarding Chavez's abilities despite her impairments vague and non-specific. Because a report is not rendered incomplete if it is missing a statement regarding the claimant's abilities despite her impairments, the ALJ was not required to contact Dr. Shamberg to revise his report. However, on remand, the ALJ will have an opportunity to contact Dr. Shamberg to clarify his report.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this order.

ENTERED this 15th day of April, 2015.

/s/ Andrew P. Rodovich
United States Magistrate Judge